IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| CAROLYN GRAVES, As Administrator of the Estate of WILLIE MAURICE JONES, <br><br> Plaintiff, <br><br> vs. <br><br><br> CITY OF WATERLOO, IOWA, ALBERT BOVY, <br><br><br> Defendants. | No: 6:10-CV-02014-LRR <br><br><br> **DEFENDANTS' BRIEF IN SUPPORT OF MOTION IN LIMINE** |

___

COME NOW, Defendants, the City of Waterloo and Albert Bovy, by and through their attorney of record, and submit the following Brief in support of their Motion in Limine pursuant to LR 7.

**TABLE OF CONTENTS**

I. FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A. PLAINTIFF'S PRIOR ACQUITTAL IN THE UNDERLYING CRIMINAL PROCEEDING IS UNFAIRLY PREJUDICIAL TO DEFENDANTS' DEFENSE OF PLAINTIFF'S CLAIMS AND SHOULD BE EXCLUDED UNDER FEDERAL RULE OF EVIDENCE . . . . . . . . . . . . . . . . . . . 8

    B. PLAINTIFF'S EXPERT RON KNAPP IS NOT A QUALIFIED EXPERT UNDER FEDERAL RULE OF EVIDENCE 702 AND HIS TESTIMONY SHOULD BE EXCLUDED. . . . . . . . . . . . 10

        1. Ron Knapp's expert opinions and testimony do not assist the trier of fact.. . . 17

**I.    FACTUAL BACKGROUND**

The Plaintiff has alleged a 42 U.S.C. § 1983 federal claim against the Defendant Albert Bovy in his capacity as an officer with the City of Waterloo Police Department. Plaintiff's claim is based upon an alleged deprivation of Willie Jones' constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The Plaintiff has further asserted state claims under Iowa law for false arrest, malicious prosecution, and the intentional infliction of

emotional distress against Defendants Albert Bovy and the City of Waterloo. All of the aforementioned claims arise from Mr. Jones' arrest and subsequent detention on February 21, 2008. Mr. Jones was subsequently prosecuted in a criminal proceeding on state charges of possession of marijuana and possession of marijuana with the intent to sell in Case No. FECR152568. A jury found Mr. Jones not guilty of the possession charge only and all charges were dismissed by the Court's Order filed May 23, 2008. Mr. Jones then filed suit in the instant case.[1]

Plaintiff designated Ron Knapp as an expert in her Rule 26 expert disclosure. Plaintiff's Rule 26 Designation of Expert Witnesses states that Mr. Knapp "will testify that he has the professional training and equipment to capture individual frames from certain video recordings including the videos recorded by the police vehicles of Steve Bose and Michael Dobson." *See* attached Exhibit A at p. 2. It states Mr. Knapp "will testify that he was able to find a frame in the video from Michael Dobson's vehicle that shows a reflection off of an item that appears to be in a direct line between [Defendant] Albert Bovy's hand and the area where Albert Bovy reaches his hand down to the ground." *Id.* It states Mr. Knapp "will testify that the reflection from an object in the area between Albert Bovy's and where Albert Bovy reaches down to the ground is only in one frame and was not stationary." *Id.* It states Mr. Knapp "will testify that if the reflection on the individual video frame were from snow or ice the reflection would be in more than one frame." *Id.* Mr. Knapp has not authored any publications. *Id.* "His review of the materials in the case has been limited to the video recordings from the police vehicles of [Officers] Steven Bose and Michael Dobson." *Id.*

Mr. Knapp, in his Fed. R. Civ. P. Rule 26(a)(2) signed expert interrogatory answer, when asked to provide a description of the specialized field in which it is claimed that such witness will qualify as an expert witness, provides "[v]ideo production and analysis of video images and graphic images." *See* attached Exhibit B. Mr. Knapp, when asked to set forth in detail the substance of the facts and opinions upon which he will testify, states, "Will testify as to his viewing of the police videos and his identification of a reflection from an object that appears to be falling on a direct line from Defendant Bovy's hand to the area on the ground where Defendant Bovy claims to have found

---

[1] On January 24, 2011, the Court granted Plaintiff's Amended Motion to Substitute Parties and directed the Clerk to change the name of the Plaintiff to "Carolyn Graves, as Administrator of the Estate of Willie Maurice Jones" due to Mr. Jones' death.

controlled substances. *Id.* When asked to provide a summary of the grounds of each opinion, Mr. Knapp states, "I answered this interrogatory after viewing the video with computer software designed for video editing. This software allows me to view the video frame by frame." *Id.* Mr. Knapp, when asked to set forth in detail the sources, literary or otherwise, he relies upon as a basis for his expert opinion, states, "My experience, 20 plus years of video editing and reviewing. I have reviewed similar types of videos for casinos and surveillance tapes from the Waterloo Police Department." *Id.*

At his deposition taken on June 20, 2011, Mr. Knapp elaborated on his educational background, qualifications, and work experience, in addition to, modifying one of his primary opinions set forth in his original Rule 26(a)(2).

Mr. Knapp has no educational degrees other than a GED he received from Hawkeye Community College. *See* Exhibit C at p. 5. He has no formal training in video production or video analysis, he was self-taught. *Id.* He has not formally taught video production. *Id.*
Mr. Knapp has twenty-five years of experience in video production. Id. Mr. Knapp got involved in video production because he was unemployed. *Id.* at pp. 6-7. He borrowed a friend's video camera and taped weddings for three to four years to make a living until he could find more stable work. *Id.* at p. 7. After this, he began to produce corporate and industrial television commercials. *Id.* at p. 8. He essentially produced videos and to do this he "would write the copy for the script, do the storyboarding, shoot, edit, from conception to completion of a video project." *Id.* at p. 8.

He currently operates his business as a sole proprietorship under the name "Creative Video Group". *Id.* at p. 10. When asked to summarize what Mr. Knapp actually does in his business, he states, "Just about anything associated with the production of video, including writing, shooting, editing, graphics." *Id.* at p. 12. He spends twenty-five percent of his production time "shooting video" and the remaining seventy-five percent of the time is involved in editing and graphics. *Id.* at p. 15. When asked to summarize what editing and graphic work entails, he states, "Well, once I have acquired the video that I need to edit a project, I take them into a -- into editing software on my computer and arrange the clips the way that I want them according to what we have for audio. And then if a graphic is needed, say a name of a person to identify a person or to identify a deal on a product, then I'll create the graphic that conveys that message." *Id.* at pp. 15-16. The editing process is performed on a computer using software and images are projected onto a computer

monitor. *Id.* at p. 16.

Mr. Knapp has reviewed videos for casinos and surveillance tapes from the Waterloo Police Department. *Id.* at p. 24. Mr. Knapp says he done work for the Waterloo Police Department on prior occasions. *Id.* He only recalls one specific instance, however, when he was asked by a police officer "to try to clean up audio so that what was being said and captured would be more clear." *Id.* at pp. 24-25. In another instance, a police officer from Evansdale brought him a surveillance video taken from a local high school and asked him to capture frames from it. *Id.* at pp. 25-26.

Mr. Knapp recalled one instance where Lynn Moller from Veridian Credit Union brought him a video to capture an image of an armed robbery. Similarly, the work he performed for the casino merely involved "capturing frames." *Id.* at p. 27. He acknowledges that his work for the Waterloo Police Department and Veridian Bank did not involve actually analyzing anything in the videos themselves or rendering opinions as its content but basically editing videos. *Id.* at p. 26.

The following pertinent question and answer was elicited at Mr. Knapp's deposition"

> Q: How many occasions have you worked for [Plaintiff's counsel, Tom Frerichs] other than this case involving Mr. Jones?
> A: Maybe twice.
> Q: Basically, what I do for everyone, and that's capturing frames.
> Q: In other words, reviewing a video or audio recording and then trying to capture or isolate portions of that to show whatever events have been recorded?
> A: Correct.

*Id.* at pp. 28-29.

\*\*\*\*\*\*\*\*\*\*\*

> Q: So in [these prior instances where you have consulted with law enforcement and bank personnel], what you're doing is taking and capturing frames of specific events that have already been recorded - -
> A: Correct.
> Q: - - so that they can show those or use those in evidence in criminal proceedings, basically.
> A: Correct.

-4-

> Q: So in other words, you'd isolate a certain segment of the audio so that it could be presented and people could understand what was actually being said on a video.
>
> A: Correct.
>
> Q: You weren't actually analyzing anything that was in the videos.
>
> A: I was rendering no opinions.

*Id.* at pp. 26-27.

************

> Q: And in all these instances where you've consulted with the attorneys and law enforcement and the private investigators, what you've been basically asked to do is review a video recording and then capture frames or portions of that recording for better presentation of whatever is show there. Is that basically the gist of it?
>
> A: Yes.....*I have never enhanced video in any way*. I have tried to enhance audio to make it more legible. But my primary function was to capture still frames of video.
>
> Q: This is the first case, though, in which you've actually been asked to review a video and then give opinions about what's shown in the video. Is that a fair statement?
>
> A: Yes.

*Id.* at pp. 29-30.

*******

> Q: So in these other instances when you were doing this work for the law enforcement and the private invesetigators and the attorneys, you'd simply review the videos, provide them with the information, and then they would utilize it however they chose to do so?
>
> A: I wasn't providing information for them. I was essentially providing still frames.
>
> Q: But you never testified with respect to whatever you captured in that other

work?

A: No.

*Id.* at pp. 30-31.

********

The only items Mr. Knapp reviewed in connection with his work in the case were of the two in-car videos in Officer Bose and Officer Dobson's vehicles. *Id.* at p. 32. He has not reviewed any other materials, educational or otherwise. *See Id.* Up until the time of Mr. Knapp's deposition, he had not maintained any other materials other than the two videos in his expert file. *Id.* When asked to describe the activity he had done in the case and if video analysis would be a fair way to characterize his work, Mr. Knapp replied, "I don't know that I was analyzing anything." *Id.* at p. 6. "Basically what I was doing was capturing frames." *Id.*

Upon Plaintiff counsel's initial contact, Mr. Knapp was asked to review the subject video and give his opinion as to what he saw in a certain segment of the video, that segment being "where the dog was around the vehicle and going through the part where the officer picked something up off the ground." *Id.* at p. 32, 34. Prior to Mr. Knapp's review of the subject videos, Plaintiff's counsel Tom Frerichs specifically asked Mr. Knapp to look for a reflection while the officer is standing by the vehicle, and when he found that, Mr. Frerichs asked for an opinion on what the reflection might be. *Id.* at pp. 34-35.

When asked at his deposition to review his Rule 26(a) expert interrogatory answer as to its accuracy, Mr. Knapp made the comment, "[The Rule 26(a) expert interrogatory answer says, 'That [Mr. Knapp] has the professional training,' if you consider that being self-taught." *Id.* at p. 20. Mr. Knapp further modified his original opinion contained in his Rule 26(a) interrogatory answer as he could not say that his identification of a reflection on one of the video frames was from an object that appears to be falling. *Id.* at pp. 22-23. He stated at this deposition that could not say that it was an object that was falling. *Id.* at p. 23. Mr. Knapp clarified matters by saying that subsection (d) of his expert disclosure should read, "Will testify as to his viewing of the police videos and his identification of a reflection." *Id.* As indicated above, Mr. Knapp had initially stated he would testify as to "his identification of a reflection from an object that appears to be falling on a direct line from Defendant Bovy's hand to the area on the ground where Defendant Bovy claims to have found controlled substances." *Id.*

The following pertinent answers were elicited from Mr. Knapp as to the process he utilized in arriving at his expert opinions in the case:

> Q: Describe for me how you went about reviewing the videos in this case.
>
> A: The videos that come from the Waterloo Police Department can only be viewed on their proprietary software. And so when I open up the file, their software automatically opens, and I am able to look at the video.
>
> Q: How did you discover that there was a reflection [contained in Officer Dobson's in-car video]?
>
> A: I shuttled through that segment of the video [where the narcotics dog passes by the passenger side of Willie Jones' vehicle] frame by frame on [the Waterloo Police Department's] proprietary software.
>
> Q: And as you did so, you isolated, as I understand it, one frame that shows the reflection; is that correct?
>
> A: Correct.

*Id.* at pp. 33-36.

Mr. Knapp even acknowledged at his deposition that in reaching his conclusion that the reflection beneath Defendant Bovy's arm is more likely than not to have been caused by an object rather than an anomaly would not require expertise in video analysis. *Id.* at pp. 67-68. Towards that end, the following testimony was elicited from Mr. Knapp:

> Q: [Y]ou told me that you could not state with any degree of certainty in your field of video analysis or review that that reflection is from an object. Did I misunderstand you?
>
> A: Possibly. My opinion is that it is more likely to be a reflection than an anomaly.
>
> Q: Can you say with a reasonable degree of certainty in your field of video analysis that that reflection is caused by an object?
>
> A: It's more likely than not that it is caused by an object.
>
> Q: And the basis for that opinion is that it appears on only one frame. In other words, if you take the frame before, it's not there; then it's there; and then it's not in the following frame.

-7-

> A: Correct. And it doesn't appear again that I recall.
>
> Q: Okay. Would you agree with me, Mr. Knapp, that reaching that conclusion does not require expertise in video analysis?
>
> A: *Some degree*.

*Id.* at p. 68.

In fact, Mr. Knapp admits his expert opinion that the alleged object shown on the captured video frame beneath Defendant Bovy's arm is more a reflection than an anomaly is not based upon his experience in his field of expertise. Towards that end, the following testimony was elicited from Mr. Knapp:

> Q: Does the fact that this reflection occurs in a direct line between the officer's hand and where he reaches down make it more likely to you than what you're seeing is a reflection as opposed to an anomaly?
>
> A: Yes, but that's more -- I don't think that -- I don't think that is from my experience in the field as much as it is as just finding that to be interesting.

*Id.* at pp. 75-76.

Nowhere in Mr. Knapp's deposition testimony does he indicate he has ever performed or been asked to perform object identification in a video recording and video analysis of still or moving objects prior his involvement in the present case. *See* attached Exhibit C.

**II. ARGUMENT**

**A. PLAINTIFF'S PRIOR ACQUITTAL IN THE UNDERLYING CRIMINAL PROCEEDING IS UNFAIRLY PREJUDICIAL TO DEFENDANTS' DEFENSE OF PLAINTIFF'S CLAIMS AND SHOULD BE EXCLUDED UNDER FEDERAL RULE OF EVIDENCE 403**

"The essential elements of a § 1983 claim are that the defendant(s) acted under color of state law, and that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009)

Under the law of Iowa, which governs the rights of the parties to the present suit with respect to the state claims against Defendants Bovy and the City of Waterloo, the elements necessary to support an action for false arrest are (1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint. *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982). It should be noted that under Iowa law, a peace officer "may make a warrantless arrest when he has

-8-

Case 6:10-cv-02014-JSS   Document 30-1   Filed 08/19/11   Page 8 of 19

reasonable ground for believing that an indictable public offense has been committed and has reasonable ground for believing that the person arrested has committed it." *Children v. Burton*, 331 N.W.2d 673, 679 (Iowa 1983).

In order to prevail on a claim for malicious prosecution, which is similar in nature to a claim for false arrest, a plaintiff must prove (1) a previous prosecution, (2) instigation or procurement thereof by defendant, (3) termination of the prosecution by an acquittal or discharge of plaintiff, (4) want of probable cause, (5) malice in bringing the prosecution on the part of the defendant and (6) damage to plaintiff. *Sarvold v. Dodson*, 237 N.W.2d 447, 448 (Iowa 1976).

The Court has broad discretion in admitting and excluding evidence. *Control Data Corp. v. Int'l. Business Machine Corp.*, 421 F.2d 323 (8th Cir. 1970).

Defendants anticipate that Plaintiff's counsel and witnesses called at trial to repeatedly reference the fact that Mr. Jones was acquitted of the state criminal charges levied against him in an effort to impress upon the jury the notion that because of the acquittal, Defendants must not have had probable cause in arresting and detaining him. Indeed, the real objective is to persuade the jury that the criminal jury determined that Officer Bovy planted evidence. Thus, the effect of such evidence, aside from establishing the first and third elements of Plaintiff's malicious prosecution claim, would be to inflame the jury into believing that the police officers did not have probable cause to arrest Mr. Jones, that the charges were obtained with malice, and/or that the police officers were being deceitful or underhanded.

In order to eliminate this unfair prejudice to the Defendants and any likelihood of Plaintiff's counsel needlessly presenting cumulative evidence on the issue, Defendants have stipulated to the Plaintiff establishing the first and third elements of his malicious prosecution claim; specifically, that there was a previous prosecution which was unsuccessful.

Defendants contend that Mr. Jones' acquittal on the possession with intent to deliver charge has no relevance to any of his claims, again aside from satisfying the first and third elements of his malicious prosecution claim, and which merely provide the foundation for which to assert the claim in the first instance. *Van Sant v. American Exp. Co.*, 158 F.2d 924, 930 (3rd Cir. 1946); "[T]he mere fact of the acquittal of the defendant in the criminal proceeding is not evidence in an action for malicious prosecution of the want of probable cause for the prosecution."); *Poppell v. City of San Diego*, 149 F.3d 951, 963 (9th Cir. 1998) ("An acquittal. . .reveals very little-if anything-about

whether the charges were procured with malice.). It is significant that in a malicious prosecution case, "probable cause does not depend upon the guilt or innocence of the accused party." *Sundholm v. City of Bettendorf*, 389 N.W.2d 849, 852 (Iowa 1986). "Rather, it depends upon the honest and reasonable belief of the party causing the prosecution." *Id.* citing *Gordon v. Noel*, 356 N.W.2d 559, 562 (Iowa 1984). Similarly, an acquittal has no relevance in a false arrest case where "the issue of probable cause turns on what the officer knew at the time of the arrest, not what he learned later." *Id.* citing *Children v. Burton*, 331 N.W.2d 673, 678 (Iowa 1983).

Defendants, in further support for seeking to exclude any reference to Mr. Jones' acquittal, point out that the burden of proof in a criminal proceeding wherein the prosecution must prove its case beyond a reasonable doubt is far higher than that in a civil proceeding, which only requires a showing by a preponderance of the evidence. Furthermore, it is Plaintiff who now has this burden. Therefore, the acquittal only establishes that the state didn't meet its more rigorous burden in the criminal action. It has no probative value in establishing Plaintiff's claim.

Even if the acquittal evidence has some probative value, it is substantially outweighed by its prejudicial impact and should be deemed inadmissible under *Fed. R. Evid.* 403. *See* Fed. R. Evid. 403.

Therefore, Defendants request that Court exclude any reference to Mr. Jones' acquittal in the criminal proceeding and further prohibit the Plaintiff from introducing any documents into evidence which reference the acquittal.

**B.    PLAINTIFF'S EXPERT RON KNAPP IS NOT A QUALIFIED EXPERT UNDER FEDERAL RULE OF EVIDENCE 702 AND HIS TESTIMONY SHOULD BE EXCLUDED**

"The starting point for analyzing expert testimony is Federal Rule of Evidence 702." *Dancy v. Hyster Co.*, 127 F.3d 649, 651-52 (8th Cir. 1997). Federal Rule of Evidence 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FRE 702.

While "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," the Eighth Circuit Court of Appeals does not endorse a policy of qualifying any proffered witness as an expert. *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 283 (8th Cir. 1995); *see also Smith v. Rasmussen*, 249 F.3d 755, 759 (8th Cir. 2000). "The threshold question of whether a witness is competent as an expert is solely for the trial judge, and, as the rest of Rule 702 suggests, the central issue is whether the expert's testimony will assist the trier of fact." *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d at 283. "Once the trial court has determined that a witness is competent to testify as an expert, challenges to the expert's skill or knowledge go to the weight to be accorded the expert testimony rather than to its admissibility." *Id.*

The trial court has broad discretion to admit and exclude expert testimony. *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 296 (8th Cir. 1996).

Defendants contend Plaintiff's expert Ron Knapp does not satisfy that component of Rule 702 requiring a witness to be qualified as an expert by knowledge, skill, experience, training, or education. *See* Fed. R. Evid. 702. In this case, Mr. Knapp was solicited by Plaintiff's counsel to perform video analysis which requires professional expertise in that field. *See* attached Exhibit C at pp. 32-35. Specifically, Mr. Knapp was requested to provide expert testimony as to the identification of a reflection allegedly shown in the in-car video of Officer Michael Dobson. *Id.* However, the record undisputably reflects Mr. Knapp has no knowledge, skill, experience, training, or education in the field of video analysis. Instead, the extent of Mr. Knapp's work experience has been limited to video production, editing, audio enhancement, and capturing frames within video recordings for various law enforcement personnel and private industries. *See* attached Exhibit C at pp. 26-31.

Mr. Knapp's prior experience has been in video production which Mr. Knapp says entails "just about anything associated with the production of video, including writing, shooting, editing, graphics." *See* attached Exhibit C at pp 12-15. With respect to the editing work he has previously performed, Mr. Knapp states that the editing process is performed on a computer using software and that the images are simply projected onto a computer monitor. *Id.* None of these tasks involve detailed object identification and analysis, certainly not to the level which Mr. Knapp has been designated to provide expert testimony in this case involving object analysis in the context of competing background visuals and multiple video frames.

Further, as stated above, Mr. Knapp has never previously performed or been asked to perform video analysis of still or moving objects. *See* attached Exhibit C. This was Mr. Knapp's first foray into performing a task involving video analysis and object identification. *Id.* at pp. 29-30.

The record reflects that the extent of his formal education was obtaining a GED from Hawkeye Community College. *Id.* at p. 5. He has no formal training in video production or video analysis and proclaims to be self-taught in these disciplines. *Id.* He has not formally taught video production. *Id.* The record is void as to whether Mr. Knapp is a member of any organizations which pertain in any way to video analysis (or video production and editing for that matter).

Defendants believe the case *Navarro-Camacho v. United States* is instructive as to baseline qualifications an expert should have to provide competent testimony in the field of video analysis. In that case, the criminal defendant at the underlying motion to suppress hearing argued that there was no probable cause to search his vehicle, in part, because the videotape made of the traffic stop showed one police officer passing an alleged drug object to the other officer and which the defendant contended was used to "smear" the car so that the narcotics dog would alert. *Navarro-Camacho v. United States*, 186 F.3d 701, 704 (6th Cir. 1998).

Both parties in that case designated experts to interpret and analyze the police video. *Id.* The defendant called "an expert witness in the field of optics and applied mathematics who testified that the videotape showed that an object was indeed passed from [one officer to the other]." *Id.* The prosecution's expert, a photographic specialist, testified "that the videotape did not show the passing of an object but, rather, was simply the reflection of sunlight off of [the officer's] hand." *Id.*

Although there is no indication or suggestion that the defendant raised the issue as to a photographic specialist not being qualified to render expert opinions with respect to video analysis in *Navarro-Camacho*, a cursory review of general qualifications and training for a photographic specialist per an United States military website reveals that a "Photographic specialist takes and develop still color or black and white photographs." *See* attached Exhibit D, http://www.careersinthemilitary.com/index.cfm?fuseaction=main.careerdetail&mc_id=59). Under the section entitled "Helpful Attributes", the website states, "Helpful school subjects include photography, chemistry, art, and mathematics." *Id.* Under the section entitled, "Training Provided," it states, in pertinent part, "Further training occurs on the job and through advanced courses." *Id.*

-12-

"Course content typically includes, "Photographic processing and reproduction, [p]rinciples of photojournalism, and [o]peration and maintenance of photographic equipment..." *Id.*

In contrast, the qualifications of an expert witness in the field of optics and applied mathematics almost certainly would entail extensive academic rigors and practical training.

Although Defendants are mindful that "Rule 702 does not rank academic training over demonstrated practical experience", the extent of Mr. Knapp's formal education should not be downplayed in this case, where here, he has no formal training or skill in the field of video analysis. *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990). Notwithstanding a complete lack of academic training (and education) in the requisite field, Plaintiff cannot plausibly contend Mr. Knapp "possesses sufficient knowledge gained from practical experience.*" See Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990) ("[A]n individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise."). Again, as stated above, it is undisputed that Mr. Knapp has no practical experience in video analysis.

Perhaps the most persuasive argument as to why Mr. Knapp is not qualified to provide expert testimony comes from Mr. Knapp himself. Mr. Knapp admits his expert opinion that the alleged object shown on the captured video frame beneath Defendant Bovy's arm is more a reflection than an anomaly is not based upon his experience in his field of expertise, that expertise presumably being video production and editing. See attached Exhibit C at pp. 67-68. Mr. Knapp's answer to the following question at his deposition further confirms that video production and not video analysis is his field of expertise and which is not relevant to the subject area upon which he intends to testify:

> Q: Well, statistically for that anomaly to happen, to show up in the exact spot between his hand and the ground, does that make it, in the context of everything that you viewed, less likely that what you're viewing is actually an anomaly as opposed to a reflection?
> A: Yeah. And I think I've been over the anomaly part of it a number of times now. If there are -- and I don't know that anybody, *regardless of their experience in video production*, can look at that frame and tell you with any certainty at all whether that's an anomaly or not. But I can tell you that *most*

-13-

*people with experience in video production* would say that the likelihood of an anomaly would be more prevalent in the darker areas of the video.

*Id.* at p. 76 (emphasis added).

The Plaintiff's own Rule 26 Designation of Expert Witnesses filed in this case merely states that Mr. Knapp "will testify that he has the professional training and equipment *to capture individual frames from certain video recordings* including the videos recorded by the police vehicles of Steve Bose and Michael Dobson (emphasis added)." *See* attached A. It does not state he has the professional training and equipment *to analyze and identify objects in* individual frames from video recordings. *See Id.* In fact, Mr. Knapp, when asked to describe the activity he had done in the case and if video analysis would be a fair way to characterize his work, Mr. Knapp replied, "I don't know that I was analyzing anything." *See* Exhibit C at p. 6. "Basically what I was doing was capturing frames." *Id.*

Because Mr. Knapp is not an expert in video analysis or video content analysis, he was not able to state to a reasonable degree of certainty in his field of expertise what caused the reflection in the video. *See Id.* at pp. 49-51, 53.

Indeed, Mr. Knapp's deposition testimony indicates that his practical knowledge or experience alone, and which he relies solely upon as a basis for rendering opinions in this case, does not provide him with the requisite expertise in video analysis[2]. The Court need look no further than Mr. Knapp's testimony as to why he could not state to any degree of professional certainty the cause of the reflection beneath Officer Bovy's arm, and the reflection to which he intends to testify to at trial:

> Q: Can you say or rule out that that reflection [depicted in the captured video frame allegedly shown beneath Officer Bovy's arm], as you see it in that frame, is caused by an anomaly or a distortion of the video itself? Do you

---

[2] "Video Content Analysis (VCA) is the capability of automatically analyzing video to detect and determine temporal events not based on a single image. As such, it can be seen as the automated equivalent of the biological visual cortex....Many different functionalities can be implemented in VCA. Video Motion Detection is one of the simpler forms where motion is detected with regard to a fixed background scene. More advanced functionalities include video tracking and egomotion estimation...VCA relies on good input video, so it is often combined with video enhancement technologies such as video denoising, image stabilization, unsharp masking and super-resolution." (http://en.wikipedia.org/wiki/Video_Content_Analysis).

-14-

understand what I'm saying? In other words, can you say with certainty that an anomaly is not causing that reflection?

A: Anomalies are anomalies, and who's to determine which is an anomaly?

Q: So it could be an anomaly from the video itself?

A: Usually anomalies appear in low lighting in video. And where that particular reflection appears, the likelihood that it is an anomaly is a lot less than it would be in all of these very, very dark areas [contained with the captured video frame]. But I don't believe anyone can determine whether or not it's an anomaly or an absolute reflection.

*Id.* at pp. 53-54.

****

Q: I want to talk about this discussion that you had about anomalies. Earlier I believe you said that you saw a reflection from an object. And if I'm wrong, you know, correct me.

A: My opinion is that it was probably from an object. And like I've stated, what that object is -- and I believe I testified to this at [the criminal trial]. *I don't know what that object is. It could be anything, including a reflection from the snow behind. I don't know.*

Q: But if it was a reflection from the snow behind or a reflection from a fixed object, would you expect to see it in more than one frame?

A: Yeah.

Q: Why would you expect to see it in more than one frame?

A: Yes, because when I originally viewed the video, and having just reviewed it again, as I advance the frames before that particular frame where the reflection appears and advance it after the reflection appears, I didn't see the reflection appear in that particular piece, where if -- if it were coming from the snowbank behind, I would have fully expected to see that reflection again.

*Id.* at pp. 57-58.

Mr. Knapp's vague answers to straight forward questions pertaining to his video analysis further demonstrates he is ill-equipped to render expert testimony in the field of video analysis. For

-15-

instance, Mr. Knapp testified as follows when asked at his deposition whether other reflections are depicted in the captured video frame:

> Q: Are there any reflections elsewhere on [the video frame capturing the alleged reflection beneath Officer Bovy's arm]?
>
> A: Well, there's so many lights going off and on. And I don't know how many, but there, I think, are at least three squad cars there, and I would imagine all their lights are going, that there are reflections in a lot of different places in the video. And that reflection, because of the strobing lights, would explain that if it were an object that was falling, why it only appears in one frame....But I would fully expect, because of the lights strobing, that at some point whatever other light that this object, whatever it is, caught that caused it to reflect right there, sooner or later that same light's going to go off again, and you would see that reflection. And I don't recall ever seeing a reflection again in that specific location after advancing the video.

*Id.* at pp. 51-52.

Given the above, it is inconceivable how Mr. Knapp could be qualified as expert in video analysis under Federal Rule of Evidence 702 as he has no academic training or education, skill, or practical experience (work related or otherwise) in that field[3]. *See U.S. v. Bahena*, 223 F.3d 797, 810 (8th Cir. 2000) (affirming district court decision to exclude testimony of alleged expert witness under Rule 702 in field of voice spectography where expert had no college degree and no formal training in voice spectography and where many of the witness's answers to technical questions were vague); *Smith v. Rasmussen*, 249 F.3d 755, 759 (8th Cir. 2000) (finding district court did not abuse its discretion in limiting expert witnesses's testimony where testimony based neither on personal experience nor knowledge of the relevant discipline); *U.S. v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (affirming district court decision to exclude testimony of alleged expert witness under Rule 702 where expert had no skill, experience, training or education in the field of handwriting analysis); *Garnac Grain Co., v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991) (noting deposition testimony of

---

[3] Defendants respectfully assert that Mr. Knapp does not possess any more skill and knowledge of video analysis than the average lay person. See Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 114 (3rd Cir. 1987) ("[A]t a minimum, a proffered expert witness...must possess skill or knowledge greater than the average layman.").

-16-

proffered expert witnesses indicates their practical knowledge does not provide them with the requisite experience in auditing and accounting).

Finally, because Mr. Knapp's practical experience consists of video production and editing and not video analysis, Defendants further contend he should not be allowed to testify as there is not a close fit between his fields of expertise and the opinions he will testify to at trial and for lack of foundation. *See Schmidt v. City of Bella Villa,* 557 F.3d 564, 571 (8th Cir. 2009) (excluding expert testimony where not a close fit between proffered expert witness experiences and the subjects on which his testimony was offered); *United States v. Ellsworth*, 738 F.2d 333, 336 (8th Cir. 1984) (expert's "conclusory statement" properly excluded for lack of foundation).

Therefore, the Court should exclude Plaintiff's expert Ron Knapp from testifying at trial pursuant to Federal Rule of Evidence 702 as he is not qualified as an expert in video object identification and analysis.

### 1. Ron Knapp's expert opinions and testimony do not assist the trier of fact

Even assuming the Court finds Mr. Knapp to be a qualified expert, Defendants contend that his expert opinions and testimony still do not assist the trier of fact. As stated above, the Court is also required to make a determination that the expert's testimony will assist the trier of fact under Rule 702. *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d at 283; Fed. R. Evid. 702.

Again, Mr. Knapp's anticipated testimony is that based upon his review of a video frame he was able to isolate from a video in former Officer Michael Dobson's patrol car, he will testify as his identification of a reflection in close proximity to Defendant Bovy's hand. *See* attached Exhibit C at p. 23. Defendants contend that this testimony does not assist the trier of fact because the average juror is able to view and analyze the very same video frame Mr. Knapp utilized and if the video shows a reflection (which Defendants strongly deny), reach the same conclusion as Mr. Knapp. No specialized or scientific knowledge is required in order to reach the opinions upon which Mr. Knapp will testify to. *See U.S. v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (expert not qualified to testify as an expert in handwriting analysis because he would not have assisted the jury and where his skill, experience, training and education as a lawyer did not make him any more qualified to testify as an expert than a lay person).

Although not part and parcel to the Court's determination on whether expert testimony may or may not assist the trier of fact, Defendants believe the very process Mr. Knapp utilized to arrive at his expert opinions to be significant. At Mr. Knapp's deposition, when asked how he discovered if there was a reflection in the subject video frame, he simply replied, "I shuttled through that segment of the video [where the narcotics dog passes by the passenger side of Willie Jones' vehicle] frame by frame on [the Waterloo Police Department's] proprietary software." *See* Exhibit C at p. 35. He then isolated the one frame on the computer showing the reflection. *Id.* at pp. 35-36. This goes to show there is no specialized or scientific methodology Mr. Knapp invoked to arrive at his conclusions.

Notwithstanding Defendants' above contentions, Mr. Knapp acknowledged at his deposition that in reaching his conclusion that the reflection in proximity to Defendant Bovy's hand is more likely than not to have been caused by an object rather than an anomaly would not require expertise in video analysis. *Id.* at pp. 67-68.

Therefore, the Court should exclude Plaintiff's expert Ron Knapp from testifying at trial pursuant to Federal Rule of Evidence 702 as his testimony will not assist the jury.

> Respectfully submitted,
> GALLAGHER, LANGLAS & GALLAGHER, P.C.
> Attorneys for Defendants
>
>
> By    */s/ Timothy C. Boller*
>        Timothy C. Boller    AT0001031
>        405 East Fifth Street
>        P.O. Box 2615
>        Waterloo, IA 50704-2615
>        319/233-6163
>        FAX: 319/233-6435
>        tboller@glglaw.net

CERTIFICATE OF SERVICE

I, Shawna L. Walton, certify that on the 19th day of August, 2011, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following attorneys of record:

Thomas P. Frerichs
751 Progress Avenue
PO Box 328
Waterloo, Iowa 50704-0328

By: ***/s/ Shawna L. Walton***
Shawna L. Walton